# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Midoree R., | Case No. 22-cv-822 (ECT/TNL) |
| Plaintiff, | |
| v. | **REPORT & RECOMMENDATION** |
| Kilolo Kijakazi, Commissioner of Social Security, | |
| Defendant. | |

James H. Greeman, Greeman Toomey, 250 Second Avenue South, Suite 120, Minneapolis, MN 55401 (for Plaintiff); and

James D. Sides, Angela Thornton-Millard, and Morris Williams, III, Social Security Administration, Office of the General Counsel, 6401 Security Boulevard, Baltimore, MD 21235, and Ana H. Voss, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for Defendant).

## I. INTRODUCTION

Plaintiff Midoree R. brings the present case, contesting Defendant Commissioner of Social Security's denial of disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and supplemental security income ("SSI") under Title XVI of the same, 42 U.S.C. § 1381 *et seq.*

This matter is before the undersigned United States Magistrate Judge on cross motions for summary judgment, Plaintiff's Motion for Summary Judgment, ECF No. 12, and the Commissioner's Motion for Summary Judgment, ECF No. 15. These motions have been referred to the undersigned for a report and recommendation to the district court, the

1

Honorable Eric C. Tostrud, District Judge for the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

Based upon the record, memoranda, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment, ECF No. 12, be **DENIED**, and the Commissioner's Motion for Summary Judgment, ECF No. 15, be **GRANTED**.

## II. PROCEDURAL HISTORY

On April 26, 2020, Plaintiff applied for DIB and SSI.  Tr. 10, 218-24.  Plaintiff asserted that she has been disabled since April 1, 2020, due to depression, anxiety, borderline personality disorder, and post-traumatic stress disorder.  Tr. 10, 220, 242.  Plaintiff's applications were denied initially and again upon reconsideration.  Tr. 10, 69-132.

Plaintiff appealed the reconsideration of her DIB and SSI determinations by requesting a hearing before an administrative law judge ("ALJ").  Tr. 10, 148-49.  The ALJ held a hearing in June 2021, and later issued an unfavorable decision.  Tr. 7-27, 31-68.  After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which was denied.  Tr. 1-6, 215-17, 315-16.

Plaintiff then filed the instant action, challenging the ALJ's decision.  Compl., ECF No. 1.  The parties have filed cross motions for summary judgment.  ECF Nos. 12, 15.  This matter is now fully briefed and ready for a determination on the papers.

### III. MEDICAL RECORDS

Plaintiff has a history of depression, anxiety, attention deficit hyperactivity disorder ("ADHD"), post-traumatic stress disorder ("PTSD"), borderline personality disorder, and panic disorder.  *See, e.g.*, Tr. 354, 365, 368, 370,  379, 387, 391, 459, 465, 481, 490-92. Plaintiff is treated by certified nurse practitioner Rebecca Nelson, CNP.  *See, e.g.*, Tr. 354, 364, 368, 370, 378, 435, 458.   Among other medications, she has been prescribed Vyvanse,[1] Wellbutrin,[2] and Lexapro.[3]  *See, e.g.*, Tr. 368-69.

### A. 2018

In June 2018, Plaintiff saw Nelson for a follow-up on her medications.  Tr. 368. Plaintiff's mother accompanied her to the appointment and noted that Plaintiff was doing "fairly well" on her medications but appeared to be more depressed lately.  Tr. 368. Plaintiff reported that she was starting a new job with a photographer and was also trying to start her own graphics business.  Tr. 368.  Plaintiff scored a 24 on the PHQ-9 questionnaire.[4]  Tr. 368.

---

[1] Vyvanse is a brand name for lisdexamfetamine, a medication used to control symptoms of ADHD. *Lisdexamfetamine*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a607047.html (last accessed June 28, 2023).

[2] Wellbutrin is a brand name for bupropion, a medication used to treat depression.  *Bupropion*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a695033.html (last accessed June 28, 2023).

[3] Lexapro is a brand name for escitalopram, a medication used to treat depression and generalized anxiety disorder. *Escitalopram*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a603005 html (last accessed June 28, 2023).

[4] The PHQ-9 questionnaire asks a person how many days he or she has had little interest or pleasure in doing things; felt down, depressed, or hopeless; had trouble falling asleep, staying asleep, or sleeping too much; felt tired or had little energy; had poor appetite or trouble overeating; felt bad about themselves; had trouble concentrating on things; moved or spoke so slowly that other people could have noticed, or felt so fidgety or restless that they have been moving around a lot more than usual; and had thoughts they would be better off dead, or of hurting themselves in some way.  *See, e.g.,* Tr. 356.

Nelson noted that Plaintiff made eye contact and was well groomed. Tr. 368. Nelson spoke with Plaintiff about one-on-one counseling, which Plaintiff had tried in the past, but she refused. Tr. 368. Nelson continued Plaintiff on Vyvanse and Wellbutrin and prescribed her Lexapro. Tr. 368-69.

In October, Plaintiff saw Nelson to have her complete work-related paperwork. Tr. 354, 370. Plaintiff reported that she has been off work because some of her coworkers were bullying her, but that she got a new job. Tr. 354, 370. Plaintiff scored an 18 on the PHQ-9 questionnaire and a 16 on the GAD-7 questionnaire.[5] Tr. 354, 370.

Nelson noted that Plaintiff got upset while talking about the situation at her work but was otherwise well groomed and made eye contact. Tr. 354, 370. Nelson filled out Plaintiff's work-related forms. Tr. 355, 371. She noted that Plaintiff did not need a change in medications. Tr. 355, 371. Nelson also suggested that Plaintiff avoid working with the person who she sees as a bully. Tr. 355, 371.

**B. 2020**

In March 2020, Plaintiff saw Nelson to discuss multiple concerns. Tr. 364, 378. Plaintiff asked about filing for disability. Tr. 364, 378. She shared that she has been struggling to maintain a job, noting that she has been harassed at many of her jobs and that she either quit or was let go from them. Tr. 364, 378. Plaintiff stated that working was "killing [her] mentally [and] emotionally." Tr. 364, 378. Plaintiff also asked Nelson about

---

[5] The GAD-7 questionnaire asks a person how many days he or she has felt nervous, anxious or on edge; not been able to stop or control or worrying; worried too much about different things; had trouble relaxing; been so restless that it has been hard to sit still; become easily annoyed or irritable; and felt afraid as if something awful might happen. *See, e.g.,* Tr. 357.

different therapy options.  Tr. 364, 378.  She stated that she was sexually assaulted multiple times, was abused while pregnant by the father of the baby, and that she suffered a miscarriage.  Tr. 364, 378.  Plaintiff reported feeling depressed and shared that she began self-harming again.  Tr. 364, 378.  Plaintiff noted that Vyvanse and Wellbutrin were helping her "immensely," but she wanted a different anxiety medication and to be tested for PTSD.  Tr. 364, 378.  Plaintiff scored a 16 on the PHQ-9 questionnaire and a 14 on the GAD-7 questionnaire.  Tr. 365, 379.

Nelson noted that Plaintiff was a bit "scattered at times" throughout the appointment, but was well groomed, well dressed, and made eye contact.  Tr. 365, 379. Nelson told Plaintiff that "it was difficult to get disability," but it "definitely looks like she needs some help."  Tr. 366, 380.  Nelson wrote that Plaintiff needs a counselor, job coach, or social worker, and recommended that she see a psychiatrist or psychologist to be tested for PTSD.  Tr. 366, 380.

In April, Plaintiff saw John Amdahl, MD, for a sexual assault evaluation.  Tr. 387. Plaintiff reported that she was sexually assaulted in her apartment by a known male.  Tr. 387.  The police department was contacted.  Tr. 387.  Dr. Amdahl noted that Plaintiff was cooperative, alert, oriented, and had normal mood and affect.  Tr. 388.

In August, Plaintiff began outpatient therapy at Nystrom and Associates with LaTasha Hamann, MA, LPCC.  Tr. 434.  Plaintiff stated that she "spiraled down a bad path" after she was sexually assaulted in April.  Tr. 434.  She stated that she gets drunk three or four times per week.  Tr. 435.  She also stated that she is unemployed and had been fired from jobs three or four times due to mental health problems.  Tr. 434.  According to

Plaintiff, she has an inability to listen, is easily distracted, and has trouble concentrating. Tr. 436.  She also reported that she has depressed mood, struggles with anxiety, irritability, and agitation, and has panic symptoms like shakes, tremors, shortness of breath, and racing heart.  Tr. 435.  She stated that these symptoms occur consistently and are moderate in severity.  Tr. 435.  Additionally, Plaintiff reported that she can maintain eye contact, receive affection, give affection, and has average self-care and communication development.  Tr. 435.

Hamann noted that Plaintiff was oriented, had normal eye contact, was well groomed, and had a normal rate and rhythm of speech.  Tr. 437.  Hamann also wrote that Plaintiff displayed a cooperative attitude, normal mood, appropriate affect, logical thought content, and a focused attention span and concentration.  Tr. 437.  Hamann opined that Plaintiff would benefit from individual therapy.  Tr. 437.  She recommended that Plaintiff attend therapy sessions to develop and maintain effective coping, interpersonal, and processing skills to manage trauma-related symptoms and current life stressors.  Tr. 437.

Plaintiff then attended therapy sessions with Hamann every week or two from August to November 2020.  Tr. 425-431, 445-51, 488.  In every session, Hamann noted that Plaintiff was oriented, engaged, and talkative.  Tr. 425, 427, 429, 431, 445, 447, 449, 451, 488.  During the first few sessions, Plaintiff displayed an anxious, sad, or depressed mood, and sometimes had a tearful affect when discussing memories or trauma.  Tr. 427, 429, 431.  In September, Plaintiff started displaying a normal mood and affect.  Tr. 425, 449, 451.  She reported a positive improvement with her mood and energy.  Tr. 425. Hamann noted that Plaintiff was making "slight improvement" and displaying growth with

finding positive ways to engage herself in positive activities and acknowledging various trauma experienced.  Tr. 425, 449, 451.

In early October, Hamann noted that Plaintiff displayed a normal mood and affect and was making "moderate improvement."  Tr. 447.  By the end of October, however, Plaintiff's progress had deteriorated slightly.  Tr. 445.  Plaintiff shared that she had heightened stressors and was feeling overwhelmed and hopeless.  Tr. 445.  Hamann noted that Plaintiff seemed depressed at times throughout the session.  Tr. 445.  Hamann recommended Plaintiff participate in dialectical behavior therapy ("DBT").  Tr. 445.  Just a few weeks later, Hamann noted that Plaintiff's progress had improved slightly and she displayed a normal mood and appropriate affect.  Tr. 488.

In November, Plaintiff also saw Nelson to follow up on her Vyvanse prescription. Tr. 458.  Plaintiff reported that she was having trouble sleeping.  Tr. 458.  She shared that she has lost seven jobs over the past three months.  Tr. 458.  She reported that she was seeing a therapist and that it was going fairly well.  Tr. 458.  Plaintiff scored an 18 on the PHQ-9 questionnaire and a 19 on the GAD-7 questionnaire.  Tr. 459.  Nelson continued Plaintiff's medication regimen of Lexapro, Vyvanse, and buspirone.[6]  Tr. 459.

Plaintiff continued seeing Hamann through the end of 2020.  Tr. 477-86.  In mid-November through early December, Hamann noted that Plaintiff had made slight improvement.  Tr. 482, 484, 486.  During those sessions, she was oriented, had a normal mood and affect, and was engaged and talkative.  Tr. 482, 484, 486.  In mid-December,

---

[6] Buspirone is a medication used to treat anxiety disorders.  *Buspirone*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a688005 html (last accessed June 28, 2023).

Plaintiff's progress had deteriorated slightly.  Tr. 479.  While she was engaged in the session, she displayed a depressed and sad mood and agitated affect.  Tr. 479.  Plaintiff shared that she received a phone call from the prosecuting attorney on the sexual assault case and was informed that the individual would not be charged.  Tr. 479.  She expressed sadness and frustration with the situation.  Tr. 479.  Still, Hamann noted that Plaintiff displayed progress with the use of distress tolerance skills with managing stressors related to past trauma, as well as symptoms of PTSD, depression, and anxiety.  Tr. 481.  During her last appointment of the year, Hamann noted that Plaintiff's progress had improved slightly.  Tr. 477.

### C. 2021

During her first two therapy sessions in January 2021, Plaintiff displayed an anxious, sad, or depressed mood.  Tr. 473, 475.  She reported experiencing stressors and struggling with self-harm behaviors.  Tr. 473, 475.  Plaintiff showed an interest in getting additional services, such as DBT.  Tr. 473.

According to Hamann, by the end of January, Plaintiff had made "significant improvement."  Tr. 471.  At the session, Plaintiff displayed a normal mood and affect, and she reported that she had not self-harmed or binge drank since her last session.  Tr. 471.  She also stated that she had been eating healthier, exploring exercise options, and planning to attend a community church group.  Tr. 471.  Plaintiff shared that she was feeling motivated to begin making positive changes and interested in participating in DBT.  Tr. 471.

From February through April, Plaintiff demonstrated slight improvement. Tr. 463, 467, 469. During each session, Plaintiff was oriented, had a normal mood and affect, and was engaged and talkative. Tr. 463, 467, 469. By mid-April, Hamann noted that Plaintiff was displaying progress with the use of distress tolerance skills with managing stressors related to past trauma, as well as symptoms of PTSD, depression, and anxiety. Tr. 465.

In the therapy sessions from April through mid-May, Plaintiff was oriented and had a normal mood. Tr. 490-92. She scored an 18 on the PHQ-9 questionnaire and a 19 on the GAD-7 questionnaire in early May, and later scored a 12 on the PHQ-9 questionnaire and a 17 on the GAD-7 questionnaire in mid-May. Tr. 491-92. During each session, Plaintiff was actively engaged and receptive to interventions. Tr. 490-92.

## IV. OPINION EVIDENCE

### A. State Agency Psychological Consultants

On initial review, Maria Yapondjian-Alvarado, Psy.D., assessed Plaintiff's mental residual functional capacity. Tr. 78, 89.

Yapondjian-Alvarado opined that Plaintiff did not have any understanding and memory limitations. Tr. 76, 87.

With respect to Plaintiff's ability to sustain concentration, persistence, and pace, Yapondjian-Alvarado opined that Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods and her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length

of rest periods.  Tr. 76-77, 87-88.  Plaintiff was otherwise not significantly limited in this area.  Tr. 76, 87.

As for Plaintiff's ability to interact with others, Yapondjian-Alvarado opined that Plaintiff was moderately limited in her ability to interact appropriately with the general public and her ability to accept instructions and respond appropriately to criticism from supervisors.  Tr. 77, 88.  Plaintiff was otherwise not significantly limited in her social interactions.  Tr. 77, 88.

Lastly, with respect to Plaintiff's ability to adapt, Yapondjian-Alvarado opined that Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting, but otherwise was not significantly limited.  Tr. 77, 88.  Yapondjian-Alvarado explained that Plaintiff "is capable of performing simple, routine and/or repetitive tasks . . . over the course of a normal workday and work week without interference from significant psychologically based symptoms."  Tr. 77, 88.  Further, Yapondjian-Alvarado wrote that Plaintiff "should be able to adapt to the customary demands of work in a competitive work setting where tasks are simple, routine and/or competitive," but Plaintiff "would do best in a work setting away from the public and with brief and superficial contact with coworkers."  Tr. 77, 88-89.

On reconsideration, Marci Mylan, Ph.D., L.P., affirmed Yapondjian-Alvarado's findings.  Tr. 104-08, 121-25.

## B. Rebecca Nelson, CNP

On June 2, 2021, Plaintiff's treating provider Rebecca Nelson, CNP, completed a mental medical source statement.  Tr. 493-95.  Nelson opined that Plaintiff's impairments

affect her ability to understand, remember, and carry out instructions.  Tr. 493.  She opined that Plaintiff is moderately limited in her abilities to understand and remember short, simple instructions, carry out detailed instructions, and make judgments on simple work-related decisions.  Tr. 493.  She also opined that Plaintiff is markedly limited in her abilities to carry out short, simple instructions and understand and remember detailed instructions. Tr. 493.  Nelson noted that because of Plaintiff's ADHD and anxiety, she has "difficulty following through."  Tr. 493.

As for Plaintiff's ability to interact with others, Nelson opined that Plaintiff is moderately limited in her ability to interact appropriately with the public and with co-workers.  Tr. 494.  Nelson opined that Plaintiff is markedly limited in her ability to interact appropriately with supervisors, respond appropriately to work pressure in a usual work setting, and respond appropriately to changes in a routine work setting.  Tr. 494.  Nelson wrote that Plaintiff has had difficulty keeping jobs, having tried—and failed to keep— about ten different jobs over that last year or two.  Tr. 494.  She also noted that Plaintiff has difficulty with interpersonal communications related to her borderline personality disorder.  Tr. 494.

Further, Nelson wrote that Plaintiff's limitations in her ability to understand and comprehend can come across as not listening.  Tr. 494.  According to Nelson, Plaintiff's anxiety "gets the best of her and she gets in defense mode."  Tr. 494.  For example, Nelson noted that Plaintiff has a tendency to deny doing actions that were witnessed when anxious. Tr. 494.  Nelson also opined that Plaintiff cannot manage benefits in her own interest, noting that Plaintiff needs guidance with her finances and her mother needs to monitor

11

what she is spending because she does not have concentration skills to do math.  Tr. 495.

Nelson wrote that disability "would be the best option for her currently."  Tr. 495.

## V. ALJ'S DECISION

The ALJ found that Plaintiff had the severe impairments of major depressive disorder, generalized anxiety disorder, panic disorder, borderline personality disorder, and post-traumatic stress disorder, and that none of these impairments individually or in combination met or equaled a listed impairment in 20 C.F.R. pt. 404, subpt. P, app.1.  Tr. 13-15.  The ALJ then found that Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:

> [Plaintiff] is limited to simple routine tasks not involving complex decision making or judgment with only occasional work place changes. She cannot be required to work at a production rate pace or quota requirements such as assembly line work. She can have only occasional contact with co-workers and supervisors and only incidental contact with the public.

Tr. 15.  In doing so, the ALJ concluded that the state agency mental consultants' opinions were persuasive, but Nelson's opinion was not persuasive.  Tr. 19-20.

The ALJ found that Plaintiff was unable to perform her past relevant work as a photographer.  Tr. 20-21.  However, the ALJ found that Plaintiff was capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  Tr. 21-22.  Specifically, based on Plaintiff's age, education, work experience, residual functional capacity, and the testimony of the vocational expert, the ALJ found that Plaintiff was capable of making a successful adjustment to the representative occupations

of hand packager, laundry laborer, and carton forming machine operator.  Tr. 21-22.

Accordingly, the ALJ concluded that Plaintiff was not under disability.  Tr. 22.

## VI. ANALYSIS

Disability benefits are available to individuals who are determined to be under a disability.  42 U.S.C. §§ 423(a)(1), 1381a; *accord* 20 C.F.R. §§ 404.315, 416.901.  An individual is considered to be disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).  This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do her previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account her age, education, and work experience.  42 U.S.C. § 423(d)(2)(A); *accord* 42 U.S.C. § 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

Disability is determined according to a five-step, sequential evaluation process.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) []he was severely impaired; (3) h[is] impairment was, or was comparable to, a listed impairment; (4) []he could perform past relevant work; and if not, (5) whether []he could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. §§ 404.1512(a), 416.912(a).

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "It means—and means only— such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted); *see, e.g.*, *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018) (defining "substantial evidence as less than a preponderance but enough that a reasonable mind would find it adequate to support the conclusion" (quotation omitted)).

This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011); *see Grindley v. Kijakazi*, 9 F.4th 622, 627 (8th Cir. 2021). The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Boettcher*, 652 F.3d at 863; *accord Grindley*, 9 F.4th at 627; *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted). Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Here, Plaintiff asserts that the ALJ erred by failing to "sufficiently justify the level of persuasiveness she applied to her review of [] Nelson's medical opinion."  Pl.'s Mem. in Supp. at 12, ECF No. 13.  According to Plaintiff, the ALJ erred by not incorporating all limitations provided by Nelson, namely, a marked limitation in her ability to interact with others and with concentration, persistence, and maintaining pace, into the residual functional capacity.  Pl.'s Mem. in Supp. at 13-15.

### A.  Evaluation of Nelson's Opinion

As Plaintiff's applications were filed after March 27, 2017, the regulations set forth in 20 C.F.R. § 404.1520c and 416.920c apply to the evaluation of medical opinions and prior administrative medical findings.  *See generally* 20 C.F.R. §§ 404.1520c, 416.920c.  Under these regulations, no deference or "specific evidentiary weight, including controlling weight," is given "to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical source." 20 C.F.R. § 404.1520c(a); *accord* 20 C.F.R. § 416.920c(a).  Rather, the "persuasiveness" of a particular medical opinion is determined based on consideration of five factors: (1) supportability, (2) consistency, (3) relationship with the claimant, (4) examining relationship, and (5) other factors.  20 C.F.R. §§ 404.1520c(c), 416.920c(c).

The first two factors, supportability and consistency, "are the most important factors" when determining the persuasiveness of a medical opinion.  20 C.F.R. § 404.1520c(b)(2); *accord* 20 C.F.R. § 416.920c(b)(2); *see also* 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Supportability means "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support

his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1); *accord* 20 C.F.R. § 416.920c(c)(1). Consistency means "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2); *accord* 20 C.F.R. § 416.920c(c)(2). Under the regulations, an ALJ "will explain how [he or she] considered the supportability and consistency factors for a medical source's medical opinions" in the decision. 20 C.F.R. § 404.1520c(b)(2); *accord* 20 C.F.R. § 416.920c(b)(2). An ALJ "may, but [is] not required to, explain how [he or she] considered the [remaining] factors." 20 C.F.R. § 404.1520c(b)(2); *accord* 20 C.F.R. § 416.920c(b)(2).

The Court finds that the ALJ properly considered the supportability factor by finding that Nelson's opinion was "not supported by the medical evidence of record." Tr. 19. The ALJ noted that Nelson did not provide a "detailed explanation" to support her opinion that Plaintiff had a marked limitation in mental functioning. Tr. 19. For example, the ALJ noted that while Nelson stated that Plaintiff has difficulty with interpersonal communication related to borderline personality disorder, she "did not indicate clinical findings from exams to support this." Tr. 19. Additionally, while Nelson explained that Plaintiff's limitations with understanding, remembering, and carrying out instructions and making decisions are based on Plaintiff's ADHD and anxiety, the ALJ "did not provide further explanation and did not cite exam findings to support this." Tr. 19-20; *see also,*

16

*e.g., Hirner v. Saul*, No. 2:21-CV-38 SRW, 2022 WL 3153720, at *5 (E.D. Mo. Aug. 8, 2022) (finding that an ALJ properly considered the supportability factor by noting that there was "no persuasive support in the record for a finding [the claimant] would arrive late, leave early or miss work more than three times per month").  Nelson failed to cite any objective medical evidence or provide persuasive explanations to support her medical opinion.  *See* 20 C.F.R. § 404.1520c(c)(1); *accord* 20 C.F.R. § 416.920c(c)(1).

Further, the ALJ properly found that the degree of limitation opined by Nelson was not supported by her own treatment notes during and around the relevant period.  *See* Tr. 20.  The ALJ noted that there was a lack of abnormal mental exam findings or notations of Plaintiff having problems understanding, communicating, or participating in primary care visits.  Tr. 20; *see Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) ("An ALJ may justifiably discount a treating physician's opinion when that opinion is inconsistent with the physician's clinical treatment notes." (quotation omitted)).  There is substantial evidence in the record as a whole to support the ALJ's conclusion in this regard.  More often than not, Plaintiff was observed to have a normal mood, *see, e.g.*, Tr. 388, 425, 437, 447, 449, 451, 463, 467, 469, 471,, 482, 484, 486, 488, 490-92, have a focused attention span or concentration, *see, e.g.*, Tr. 437, be cooperative, *see, e.g.*, Tr. 388, 437, and be engaged and talkative, *see, e.g.*, Tr. Tr. 425, 427, 429, 431, 445, 447, 449, 451, 463, 467, 469, 482, 484, 486, 488, 490-92.

The Court also finds that the ALJ properly considered the consistency factor.  The ALJ found that Nelson's opinion was not persuasive because it was "inconsistent with other evidence in the record."  Tr. 20.  The ALJ considered Nelson's opinion alongside the other

opinion evidence, including the state agency psychologists, who opined that Plaintiff could perform simple, routine, and/or repetitive tasks over the course of a normal workday and workweek without interference from significant psychologically based symptoms.  Tr. 19.

The ALJ also cited to objective medical records that were inconsistent with Nelson's marked limitation in Plaintiff's mental functioning.  For example, the ALJ noted that "the record does not document significant abnormalities on a consistent basis."  Tr. 20.  The ALJ cited records documenting Plaintiff's "normal mental exam findings at physical exams and a lack of significantly abnormal mental findings at her mental health treatment" and "normal physical exam findings."  Tr. 20; *see, e.g., Mark L. v. Kijakazi*, No. 21-cv-2281 (KMM/LIB), 2023 WL 2675145, at *2 (D Minn. Mar. 29, 2023) (finding that the ALJ properly explained his consideration of the consistency factor by noting that the medical opinion was "inconsistent with other substantial evidence of record, including the largely unremarkable mental status examination findings reported by the [Plaintiff's] other treatment providers as well as the [Plaintiff's] extensive activities of daily living.").  The ALJ also noted that Plaintiff "occasionally had abnormal mood and affect at therapy sessions, but she usually was able to engage and participate in those sessions with a lack of substantial deficits."  Tr. 20.  Further, citing therapy records, the ALJ noted that Plaintiff appeared for her therapy sessions "well groomed, pleasant, with good eye contact."  Tr. 20.

The ALJ also found Nelson's opinion inconsistent with Plaintiff's own reports of improvement with her medication and her improving exam findings.  Tr. 20; *see, e.g., Seth K. v Kijakazi*, No. 21-cv-76 (MJD/LIB), 2022 WL 3718601, at *6 (D. Minn. July 27, 2022) (finding the provider's opinion conflicting where the "Plaintiff's pain symptoms were also

reportedly improving with medication") (citations omitted), *report and recommendation adopted*, 2022 WL 3717043 (D. Minn. Aug. 29, 2022).

Additionally, the ALJ found Nelson's opinion inconsistent with the activities Plaintiff listed on her function report. Tr. 20. The ALJ noted that Plaintiff's activities "are suggestive of relatively intact mental functioning." Tr. 20; *see, e.g., Belinda B. v. Saul*, No. 20-cv-488 (JRT/LIB), 2021 WL 537932, at *9 (D. Minn. Jan. 28, 2021) (finding the activities listed in the plaintiff's function report to be "inconsistent with the high level of functional limitations opined by [the provider]"), *report and recommendation adopted*, 2021 WL 533689 (D. Minn. Feb. 12, 2021). For example, Plaintiff noted that she lives alone in an apartment. Tr. 249. On a typical day, she showers, feeds her cat, cleans her apartment, exercises, makes meals, takes her medications, gets dressed, does her hair and makeup, watches television, goes to work, then relaxes or hangs out with friends, and then has dinner with wine before bed. Tr. 250, 252. She drives a car and shops in stores. Tr. 251. She is able to pay bills, handle a savings account, count change, and use a checkbook or money orders. Tr. 251. She is "open for usually anything," and enjoys snowboarding, reading, doing artwork, camping, hanging out with friends and family, watching her favorite television shows, doing adventurous things, traveling, and cooking. Tr. 253. She spends time with others traveling, hanging out, trying new restaurants, doing new things, and doing artwork. Tr. 253; *see, e.g., Jacob R. v. Saul*, No. 19-cv-2298 (HB), 2020 WL 5642489, at *4 (D. Minn. Sept. 22, 2020) (finding the plaintiff's self-reported activities, such as "self-care activities, prepare meals, clean, do laundry, go out alone, drive a car, shop, and attend school," inconsistent with a need for a supported work setting).

Further, other evidence mentioned throughout the ALJ's decision reflects the inconsistencies with Nelson's opinion that Plaintiff is markedly limited in her abilities to carry out short, simple instructions, understand and remember detailed instructions, interact appropriately with supervisors, respond appropriately to work pressure in a usual work setting, and respond appropriately to changes in a routine work setting. The ALJ noted that Plaintiff's daily activities do not demonstrate difficulty interacting with people, as Plaintiff shops in stores and spends time with others traveling, hanging out, trying new restaurants or new things, and doing artwork twice a month. Tr. 14. The ALJ also noted that Plaintiff did not have problems communicating with or getting along with medical providers, including ones that she had just met. Tr. 14. Additionally, despite Plaintiff's claimed difficulty focusing and completing tasks, the ALJ noted that Plaintiff drives a car and manages her finances. Tr. 14. Moreover, Plaintiff's medical providers did not consistently note that Plaintiff had problems paying attention or that she needed redirection. Tr. 14. The ALJ wrote that many of Plaintiff's daily activities are indicative of relatively intact mental functioning, including preparing meals, washing dishes, doing laundry, vacuuming, sweeping, moping, wiping down tables and counters, making her bed, cleaning the bathroom, snowboarding, reading, doing artwork, camping, traveling, and spending time with family and friends. Tr. 15; *see, e.g.*, *Mark S. E. v. Kijakazi*, No. 20-cv-1954 (JFD), 2022 WL 834513, at *8 (D. Minn. Mar. 21, 2022) ("[T]he limitations in [the medical provider's] opinion are not consistent with Plaintiff's daily activities."). Overall, the ALJ's consideration of Nelson's opinion was thorough and thoughtful, and it is clear that the ALJ considered Nelson's opinion carefully with the other evidence in the record. In sum, there

is substantial evidence in the record as a whole to support the ALJ's conclusion that Nelson's opinion was not supported by or consistent with the other evidence in the record.

Plaintiff asserts that "the ALJ should have given [Nelson's] opinion more weight." Pl.'s Mem. in Supp. at 12. She argues that the ALJ conducted "a highly selective reading of th[e] record" and "impermissibl[y] cherry-pick[ed]" only those records that support her conclusions. Pl.'s Mem. in Supp. at 10, 12. Plaintiff points to notations in the record to show that Nelson's opinion is "entirely consistent with the record." Pl.'s Mem. in Supp. at 12. For example, Plaintiff cites to records where she reported ongoing depressed mood and irritability, panic symptoms, and challenges with concentration and distraction; reported feeling overwhelmed and hopeless; reported engaging in self-harm; and was noted to be anxious, sad, tearful, and agitated. Pl.'s Mem. in Supp. at 11-12. Plaintiff is essentially asking this Court to reevaluate the persuasiveness of Nelson's opinion. But it is not the function of this Court to reweigh the evidence. *See Dols v. Saul*, 931 F.3d 741, 746 (8th Cir. 2019).

For the reasons set forth above, the Court finds no error with respect to the ALJ's consideration of the supportability and consistency of Nelson's opinion under the regulations. The Court finds that the ALJ properly applied the factors under 20 C.F.R. §§ 404.1520c and 416.920c when determining the persuasive value of Nelson's opinion. The ALJ reviewed the evidence in the record thoroughly and carefully, and her "well-supported determination that [Nelson's] opinions were not [] supported by or consistent with other evidence in the record will not be disturbed." *See Jason L. v. Kijakazi*, No. 22-cv-1955 (PAM/ECW), 2023 WL 35876, at *3 (D. Minn. Jan. 4, 2023).

**B.  The Residual Functional Capacity Determination**

Plaintiff also makes a catchall argument that the ALJ's residual functional capacity is not supported by substantial evidence.  Pl.'s Mem. in Supp. at 13-15.  She contends that the ALJ erred by not incorporating all limitations provided by Nelson, namely, a marked limitation in her ability to interact with others and with concentration, persistence, and maintaining pace, into the residual functional capacity.  Pl.'s Mem. in Supp. at 14.

A plaintiff's residual functional capacity "is the most [s]he can do despite h[er] limitations."  20 C.F.R. § 404.1545(a)(1); *accord* 20 C.F.R. § 416.945(a)(1).  "An ALJ determines a claimant's [residual functional capacity] based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his or her] limitations."  *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (quotation omitted).  "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace."  *Perks*, 687 F.3d at 1092 (quotation omitted); *accord Schmitt v. Kijakazi*, 27 F.4th 1353, 1360 (8th Cir. 2022).  At the same time, the residual-functional-capacity determination "is a decision reserved to the agency such that it is neither delegated to medical professionals nor determined exclusively based on the contents of medical records."  *Norper v. Saul*, 964 F.3d 738, 744 (8th Cir. 2020); *see Perks*, 687 F.3d at 1092.  As such, there is no requirement that a residual-functional-capacity determination "be supported by a specific medical opinion."  *Schmitt*, 27 F.4th at 1360 (quotation omitted).   Nor is an ALJ "limited to considering medical evidence exclusively."  *Id.* (quotation omitted).  Accordingly, "[e]ven

22

though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Perks*, 687 F.3d at 1092 (quotation omitted); *accord Schmitt*, 27 F.4th at 1360.

In support of Plaintiff's argument, she reasserts the same argument addressed above with respect to the ALJ's evaluation of Nelson's opinion:

> As discussed *supra*, this ALJ engaged in a highly selective and optimistic review of the records when evaluating [Plaintiff's] ability to function, and her conclusions were not supported by the substantial evidence of record. For this reason, any [residual functional capacity] that was based upon an erroneous reading of the record is insufficient to support the conclusion that [Plaintiff] can sustain full-time competitive employment.

Pl.'s Mem. in Supp. at 15. As discussed above, however, there is substantial evidence in the record as a whole to support the ALJ's conclusion that Nelson's opinion was not supported by or consistent with the other evidence in the record. In other words, the ALJ properly discounted Nelson's opinion. Thus, to the extent that Plaintiff argues that the ALJ erred by not incorporating all limitations provided by Nelson, namely, a marked limitation in her ability to interact with others and with concentration, persistence, and maintaining pace, into the residual functional capacity, that argument is not persuasive.

Plaintiff's catchall argument is essentially another request for the Court to reweigh the entire medical record and come to a different conclusion, which the Court cannot do. *See Dols*, 931 F.3d at 746. To the extent that Plaintiff argues that there was substantial evidence in the record that might have supported additional residual functional capacity limitations and a finding of disability, the Court may not reverse the ALJ simply because

substantial evidence exists to support an opposite conclusion  *See Milam v. Colvin*, 794 F.3d 978, 983 (8th Cir. 2015).  Nor can this Court substitute its own judgment or findings of fact for those of the ALJ.  *See Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). Therefore, the Court finds that Plaintiff's catchall argument that the ALJ's residual functional capacity determination is not supported by substantial evidence is unpersuasive in light of the record as a whole.

Further, the Court finds that the ALJ's residual functional capacity determination as a whole is supported by substantial evidence in the record.  The ALJ considered all the relevant evidence in determining that Plaintiff had the residual functional capacity to perform a full range of work, with limitations to simple routine tasks not involving complex decision making or judgment, among others.  Tr. 15.

First, the ALJ summarized the medical records, noting that although Plaintiff has received mental health treatment, she has not required significant treatment.  Tr. 17-18. The ALJ noted that Plaintiff experienced some improvement with medication and therapy. Tr. 17.  The ALJ also noted that there was a lack of abnormal mental exam findings.  Tr. 17.  She also cited several medical records where Plaintiff was alert, oriented, cooperative, engaged, and talkative, with normal mood, affect, and eye contact, and had logical thought content, focused attention span and concentration, and normal speech.  Tr. 17-18.

Additionally, the ALJ properly looked beyond the medical evidence, considering, among other things, Plaintiff's function report and testimony at the hearing, including the symptoms she experiences, as well as her daily activities.  The ALJ wrote that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms

are not entirely consistent with the medical evidence and other evidence in the record . . . ." Tr. 16. The ALJ noted that Plaintiff's "activities speak to the relatively intact nature of [her] mental functioning and as a whole are not indicative of an individual who is limited mentally to a greater extent than as set forth in the residual functional capacity." Tr. 18.

The ALJ also considered the opinion evidence properly. In addition to evaluating the medical opinion of Nelson, discussed above, the ALJ considered the opinions of the state agency psychological consultants. They opined that Plaintiff "is capable of performing simple, routine, and/or repetitive tasks and should be bale to sustain those tasks over the course of a normal workday and workweek without interference from significant psychologically based symptoms." Tr. 19. The state agency psychological consultants also opined that Plaintiff "should be able to adapt to the customary demands of work in a competitive work setting where tasks are simple, routine, and/or competitive," but that Plaintiff "would do best in a work setting away from the public and with brief and superficial contact with coworkers." Tr. 19. The ALJ found that the state agency psychological consultants' opinions persuasive because their "explanation and the records they reviewed generally support their findings." Tr. 19. The ALJ noted that the state agency psychological consultants referenced Plaintiff's relatively intact activities from her function report, mental status exams that were relatively normal, therapy notes that were relatively normal, and lack of other abnormal mental findings or significant treatment. Tr. 19. Regarding the interaction limitations, however, the ALJ found the state agency psychological consultants' limitations were "slightly too restrictive" because "[t]he records better support and are more consistent with [Plaintiff] having occasional contact with

coworkers and supervisors and only incidental contact with the public." Tr. 19. The ALJ found that the records showed that Plaintiff did not have problems communicating or interacting and was cooperative with medical providers. Tr. 19. Further, the ALJ noted that Plaintiff's daily activities, like spending time with friends and family doing activities in public around others, support more interaction abilities than found by the state agency psychological consultants. Tr. 19. The ALJ also referenced Plaintiff's presentation at the hearing, noting that Plaintiff "was well spoken, articulate, and cooperative," which is inconsistent with the full extent of the interaction limitations. Tr. 19. The Court finds that the ALJ gave good reasons for finding the state agency psychological consultants' opinions persuasive and, as discussed above, for declining to do so for Nelson's opinion. Thus, the Court concludes that the ALJ's residual functional capacity determination is supported by substantial evidence in the record as a whole. The ALJ considered the entire record fully and fairly.

For the reasons stated above, the Court finds that the ALJ properly undertook a complete evaluation of the record. The ALJ's thorough discussion of the relevant medical evidence demonstrates that the ALJ considered and rejected Nelson's opinion. The ALJ took into account the appropriate factors when determining the weight to assign to her opinion, and Plaintiff has not met her burden to show that she has greater limitations than those determined by the ALJ. *See Perks*, 687 F.3d at 1092 (quoting *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010) ("[T]he burden of persuasion to prove disability and demonstrate [residual functional capacity] remains on the claimant")). In sum, the Court concludes that there is substantial evidence in the record to support the ALJ's residual

functional capacity. Accordingly, the Court recommends that Plaintiff's Motion for Summary Judgment be denied, and the Commissioner's Motion for Summary Judgment be granted. *See Chaney*, 812 F.3d at 676 ("The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole.") (quotation omitted).

## VII. RECOMMENDATION

Based upon the record, memoranda, and proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that:

1.     Plaintiff's Motion for Summary Judgment, ECF No. 12, be **DENIED**.

2.     The Commissioner's Motion for Summary Judgment, ECF No. 15, be **GRANTED**.

Date: June ___28___, 2023                          _____*s/ Tony N. Leung*_____
                                                                    Tony N. Leung
                                                                    United States Magistrate Judge
                                                                    District of Minnesota

                                                                    *Midoree R. v. Kijakazi*
                                                                    Case No. 22-cv-822 (ECT/TNL)

## <u>NOTICE</u>

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).